Jennie Wingad #16347
BLACKLEY & WINGAD, ATTORNEYS AT LAW
2105 E. Murray Holladay Road, Suite 2
Holladay, Utah 84117
Phone: (801) 278-3700
jennie@blackleywingad.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT, DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SHANNON S.M., *on her own behalf and on behalf of C.S.M., a minor*,<br><br>Plaintiffs,<br><br>vs.<br><br>UNIVERSAL HEALTH SERVICES, INC., and UNITEDHEALTHCARE CHOICE,<br><br>Defendants. | **COMPLAINT**<br><br>Case No. 1:21-cv-00056-DBB<br><br>Judge David Barlow |

**COME NOW** Shannon S.M., and C.S.M. collectively, individually and through their undersigned counsel, complain and allege against the above-captioned defendants as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiffs Shannon S.M. ("Shannon"), and C.S.M. ("C.S.M.") are natural persons residing in Mission, Texas. They are covered by a self-funded plan, UnitedHealthCare Choice ("the Plan") provided through Shannon's employer, Universal Health Services, Inc.

2. Plaintiff C.S.M. ("C.S.M.") is a resident of Mission Texas. As a beneficiary of her mother's health insurance plan, she received treatment at Uinta Academy ("Uinta"), a licensed residential treatment facility in Wellsville, Utah, from November 29, 2019, through February 5, 2020.

1

3. The Plan is an employee benefit plan governed by the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, et. seq.

4. This Court has jurisdiction over this matter and venue is appropriate pursuant to 29 U.S.C. §1132(e)(2) and 29 U.S.C. § 1391(c) because the Defendants do business in the State of Utah, the treatment in question was rendered in Wellsville, Utah, and the appeals were written by a company located in Salt Lake City, Utah.

5. Plaintiffs seek payment of C.S.M.'s denied claims from November 29, 2019, through February 5, 2020, pursuant to 29 U.S.C. §1132(a)(1)(B) and pursuant to the Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act").

6. Plaintiffs also seek an award of prejudgment interest and attorney's fees pursuant to 29 U.S.C. §1132(g).

## FACTUAL BACKGROUND

7. C.S.M. was adopted from Russia in November of 2014.

8. C.S.M. was evaluated by the ECI program through the Texas Department of Health and Human Services. It was determined that she had met all current milestones both physically and mentally and did not need or qualify for any services.

9. C.S.M. began counseling between 2010-2011, due to difficulty following directions and throwing a pencil and paper at her teacher, when she became angry.

10. Between 2011-2012, C.S.M was dismissed and the therapist felt she was doing fine. C.S.M. continued to struggle with angry outbursts at home.

11. Between 2013-2014, C.S.M. attended 4th grade at Our Lady of Sorrows school; her peer relationships continued to be a struggle. This was the first time C.S.M. mentioned "wanting to die", she said this to her teacher.

12. C.S.M. struggled with over-eating and weight, this often became a key issue related to being bullied.

13. Between 2015-2016, C.S.M.'s peer relations continued to be a struggle, as did her angry outbursts at home. C.S.M.'s parents continued to attempt to manage the outbursts themselves along with the help of school counselors.

14. Before school, between 2016-2017, C.S.M. ran away from home for the first time, due to being angry at a rule enforced by a babysitter at her home. She began to draw on her arm; sometimes negative words about herself.

15. C.S.M. began trying self harm, she stole scissors from a classroom and ran to the bathroom and threatened to hurt herself. On another occasion, C.S.M. took a knife from the kitchen and ran into the bathroom and threatened to kill herself.

16. In addition to school counseling, and counseling from her priest, C.S.M. returned to seek counseling from her original therapist that dismissed her. After a few sessions, the therapist explained that C.S.M needed help that she was not qualified to give. The therpapist did not know anyone locally who could help C.S.M.

17. C.S.M. sought testing from local psychologist and was diagnosed with ADHD and started on Concerta.

18. In January 2016, C.S.M. and her parents traveled to Arizona to have a complete neuropsychological evaluation from Dr. Boris Gindis from the BG Center (Center for cognitive-developmental assessment and remediation). C.S.M. was diagnosed with Encephalopathy, PTSD, chronic, mixed anxiety and depressive disorder and ADHD. Dr. Boris Gindis' believed C.S.M.'s main diagnosis was neurobiological consequences of childhood trauma. Dr. Boris recommended a very specific course of action if help was wanted for C.S.M.

19. After several meetings and not being able to find any local therapists who understand C.S.M.'s issues, her parents sought placement at Sandhill Child Development Center ("Sandhill"). C.S.M. was admitted to Sandhill on February 29, 2016 and released in August of 2017.

20. At Sandhill, C.S.M. was diagnosed with PTSD chronic and disruptive mood dysregulation disorder. She began seeing a psychologist weekly, upon returning from Sandhill until May of 2019.

21. In November 2018, C.S.M. began attending Valley Trotters Youth Ranch. She attended for 4 months, but felt the course work was too simple and boring and did not want to attend anymore.

22. During the 2018-2019 school year, C.S.M. struggled with anxiety around state mandated testing, which would cause her to have an anxiety attack, and run into the bathroom to hide.

23. On April 10, 2019, C.S.M. had told a teacher that she was going to kill herself. The school required that C.S.M. be evaluated.

24. C.S.M. went to the South Texas Behavioral Center for evaluation. After evaluation, she was admitted for depression and suicidal ideation, was placed on Lexapro 5mg and discharged on April 13, 2018.

25. Throughout the 2018-2019 summer and school year, C.S.M.'s behavior changed. C.S.M. attempted to run away 3 times and began self harming, she began more attention seeking behaviors like self harm, crying, refusing to go to class, sitting alone, etc. C.S.M. was often found by teachers locked in a stall and crying, or with a broken pen attempting to self harm, and she would be referred to the counselor.

26. In August 2018, C.S.M. began seeing another psychiatrist who increased her Lexapro to 15mg; due to experiencing more anxiety and angry outbursts.

27. In December 2018, C.S.M. was asked to leave a church based retreat, due to threatening to commit suicide.

28. March 2019, C.S.M. took some scissors from her teacher, upon finishing tutoring, ran into the bathroom and locked herself in a stall. C.S.M. was threatening to self harm, she would not come out and began hitting the wall with her fists. Due to fear of her safety, the Police and her parents were called. She was taken to the local ER by police where she was evaluated. C.S.M. was admitted to Palms Behavioral Health for one week. During the hospitalization, she was prescribed Abilify, Gabapentine along with Trazodone for sleep. Upon discharge, C.S.M. continued seeing her psychiatrist and psychologist.

29. In May 2019, C.S.M. switched counselors due to her current counselor felt she was not making progress with C.S.M. as well as the successful connection that was made between C.S.M.'s new male counselor. C.S.M. saw her new counseler weekly from May 2019 to August 2019.

30. On August 12, 2019, C.S.M. started 10th grade at Idea North Mission. By the afternoon, she was in the bathroom with a broken pen and threatening to self harm.

31. On August 13, 2019, during the second day of school, C.S.M. attempted to self harm, and ran out the building. The crisis line was called.

32. C.S.M was admitted to Doctors Hospital at Renaissance Behavioral Center on August 13, 2019 and was discharged August 20, 2019. C.S.M.'s Gabapentin was discontinued and Zoloft was added.

33. On September 3, 2019, C.S.M. attempted to jump out of her mothers car at an intersection and run away. C.S.M. had cut herself with a knife and only reentered the car upon her mother agreeing to take her back to the hospital. C.S.M. stated she felt unsafe and wanted to hurt herself, she was discharged on September 6, 2019 and her medications were increased.

34. On September 9, 2019, C.S.M. ran away from home with a pair of scissors, her mother found her. C.S.M. stated she wanted to go talk to the father of a friend. Upon finishing talking with her friend's father, C.S.M. ran from him and threatened to run in front of a car, she was restrained by her friends' family, and parents were called. C.S.M. stated she wanted to return to the behavioral hospital. During admission, the psychiatrist and her counselor advised that she needed more intensive therapy and that residential treatment should be considered.

35. C.S.M. was admitted to Big Sky Academy ("Big Sky") in Montana on September 16, 2019. However, she continued attempting to self harm (cutting, choking herself, running away). C.S.M. was asked to leave Big Sky in November 2019, due to Big Sky feeling they could not help her and that she needed a more secure environment.

36. On November 26, 2019, C.S.M. was admitted to Unita Academy ("Unita").

**Pre-Litigation Appeal of the Plan's Denial of Coverage for C.S.M.'s Care**

37. On December 4, 2019, United Behavioral Health ("UBH") sent C.S.M.'s parents a denial letter for her treatment at Uinta.

38. In this letter UBH stated C.S.M's treatment was denied based on Optum Level of Care Guidelines for Mental Health Residential Treatment Center Level of Care and "Your child's care and recovery could continue in a Mental Health Residential Treatment Center setting that meets Optum Level of Care guidelines."

39. On May 12, 2020, Shannon submitted a Level One Appeal to UBH for denial of coverage for C.S.M.'s treatment at Uinta from November 29, 2019, through February 5, 2020.

40. In this appeal letter Shannon states "This denial rationale is extremely ambiguous--United's reviewer, Laura B. Montgomery-Barefield, MD, agreed that C.S.M's treatment at the residential level of care is medically necessary...Uinta Academy is a licensed residential treatment facility that satisfies our plan's requirements to provide intermediate behavioral health treatment…""

41. "Since receiving your denial correspondence, I obtained a copy of the criteria referenced in United's denial letter, Optum's Level of Care Guideline for Residential Treatment Center Level of Care. I have also attempted to obtain a copy of my plan. However, the handbook that I received from Universal Health Services, Inc., states on page 1:

> "Please understand that this handbook highlights the benefit plans and is for your personal education. You cannot construe it as the legal plan document…"

In an effort to ensure that I have all relevant documents while writing this appeal, I requested the full, legal Summary Plan Description (SPD) from my Universal Health Systems Plan Administrator on *March 28, 2020*...I did not receive a response from Universal Health Services, Inc., regarding my request for my full SPD. In addition to reviewing this appeal, I specifically request that the reviewer take steps to ensure that I receive my plan's full SPD, including the definitions section. United's reviewer *agreed* that C.S.M. required the residential treatment level of care, but then provided me with no specific details as to how Uinta Academy does not meet their level of care guidelines."

42. On June 15, 2020, UBH responded to the Level One Appeal upholding their denial stating "care could have continued with a less intensive level of care, which was a covered benefit and available locally."

43. On August 3, 2020, Shannon submitted a Level Two Appeal.

44. Shannon stated in this letter that "UBH has failed to provide documentation that I requested twice. I sent a request correspondence to UBH on March 28, 2020, requesting my full legal policy document, or summary plan description, as the handbook I currently possess, is not a legal binding document with UBH..."

45. Prior to C.S.M's admissions to Uinta, Shannon hired a third party healthcare advocacy company to handle the preauthorization of her residential stay. The utilization review ("UR") representative first called UBH on November 27, 2019, in an attempt to get the days authorized. The UR rep was told that Uinta was not available due to being designated as not meeting guidelines. When the UR rep asked UBH what those guidelines were, she was told that the agent didn't have access to that information.

46. Shannon also states "within the plan documents I do have, UBH states the following: necessary means that the procedure, service, or supply used to treat a disease or injury must be medically required and accepted within the medical profession as the usual, customary, adn effective means of treating the disease or injury. Residential treatment for adolescent mental health issues is well accepted within the medical profession...as the "usual, customary, and effective means of treating" severs mental illness."

47. On December 3, 2019, Shannon's UR rep received a voicemail from UBH stating that admission to Uinta was a denied coverage due to a "flag". The UR rep received no further details on what this denial means and only received more excuses for denying admission to Uinta. (UR rep) was told that the facility is not authorized, "due to service components that are not consistent with UBH's systems..." clear from these calls that Uinta is seemingly flagged in UBH's systems, yet Shannon couldn't find out why this is the case.

48. Shannon states "This calls into question UBH's adherence to the Mental Health Parity and Addictions Equity Act (MHPAEA) which requires that all mental health benefits offered under a plan be covered equally...I find no evidence that other out of network intermediate medical/surgical care facilities (skilled nursing facilities, hospice, and rehab facilities) are flagged and denied in the same way, I strongly believe that UBH's method of flagging out of network mental health facilities is a violation of the MHPAEA. If I am incorrect, please provide evidence to show that analogous intermediate medical facilities are flagged in the same way residential treatment facilities are."

    i. "...The reasons for denial I have been given each time have been different:"
        1. "The first denial letter I received and referenced in my first appeal clearly stated that care in residential treatment center was warranted..confused as to why treatment in a residential treatment center is being repeatedly denied...UBH's initial reaction is that residential treatment is necessary and covered."
        2. "The second denial, which came in response to my first appeal, changed the denial reasoning and stated that, "care could have continued with a less intensive level of care, which was a covered benefit and was available locally."
        3. "The latest denial I received is now claiming that determinations are not clinical but are benefit coverage determinations. UBH...were fine making clinical decisions before about whether or not C. S-Miguel needed residential or intensive outpatient care, but now are pretending those determinations were never made."
    ii. "Facilities like Uinta are licensed as required by state law where they are located. Per Utah law:"
        1. "Residential treatment programs offer room and board and provide for or arrange for the provision of specialized treatment, rehabilitation, or habilitation services for persons with emotional, psychological, developmental, or behavioral dysfunctions, impairments, or chemical dependencies."
        2. "Not only does Uinta meet this definition, they are licensed in the State of Utah in accordance with state regulation."
    iii. "I believe UBH is discriminating against the facility itself...UBH is administering coverage in compliance with the applicable components of the Patient Protection and Affordable Care Act of 2010 (PPACA), UBH

cannot discriminate against providers who are rendering services covered within the scope of their license."

49. Uinta provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy, Uinta qualifies as an intermediate behavioral health facility under the MHPAEA.

50. On Septemeber 8, 2020, UBH responded to Shannon's Level Two Appeal upholding the denial, stating "her condition did not meet criteria for this level of care. Your child could've been treated safely in a less intensive Level of Care." Specifically stating "Your child problems were not threatening to her or other's safety."

51. On October 28, 2020, Shannon submitted a Level Two Denial Response, refuting the denial of the Level Two Appeal, specifically stating "I am unable to adequately defend my case if UBH is...changing denial rationale...UBH has consistently violated my rights under ERISA to a full and fair review."

52. On January 15, 2021, MES Peer Review Services, responded to Shannon's review of services letter.

53. MES Peer Review Services stated in their letter, the following:

> "The stated rationale for transferring the patient from Big Sky to Uinta Academy on 11/26/2019 (according to the appeal letter was to provide a higher intensity level of care for the patient. However, Uinta Academy is another residential center, and a higher level of care instead should have been a psychiatric hospital."

> "The standard of care would require a higher level of care than residential treatment, according to the MCG (Magellan Care Guidelines) criteria, as the need for repeated physical restraint and suicide watch indicated that the patient was not appropriate for residential care without better psychiatric stabilizationfor out of control behaviors. As a result, the residential treatment was not the most appropriate level of care from 11/26/2019 through 02/05/2020."

10

> "Therefore, based on the submitted records, standards of care and societal guidelines, the Residential Mental Health Services for dates of service 11/26/2019 through 02/05/2020 are not supported as medically necessary in this case."

54. The IRO Upheld the denial of benefit services.

## CAUSES OF ACTION

(Claim for Benefits Under 29 U.S.C. §1132(a)(1)(B))

55. ERISA imposes higher-than-marketplace standards on the Plan and other ERISA fiduciaries. It sets forth a special standard of care upon a plan fiduciary, namely that the administrator discharges all plan duties solely in the interest of the participants and beneficiaries of the plan and for the exclusive purpose of providing them benefits. 29 U.S.C. §1104(a)(1).

56. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that plan administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1104(a)(1)(D) and §1133(2).

57. In addition, ERISA's underlying claims procedures provide clear guidelines for appropriate review of a denied claim including, but not limited to the requirement that individuals who provide reviews based on medical opinions have credentials and expertise equivalent to the claimant's treating physician(s) ) C.F.R. §2560.503-1(h)(3)(iii).

58. The Plan's actions or failures to act constitute a breach of its fiduciary duties to the E. Family under 29 U.S.C. §1104 and §1133 in the following ways: 1) by failing to set forth the specific reasons for C.S.M.'s claim denial, written in a manner calculated to be understood by the S.M. Family; 2) by failing see that C.S.M. was a threat to herself and others 3) by failing to provide a "full and fair review," as anticipated in ERISA's claims processing regulations, of the denial of the C.S.M.'s claim.

## Claim for Relief for Violating the Parity Act

59. The Parity Act requires that if a group health plan provides both medical and surgical benefits as well as mental health or substance use disorder benefits, then it may not apply any "treatment limitation to mental health or substance use disorder benefits in any classification that is more restrictive than the predominant ... treatment limitation of that type applied to substantially all medical/surgical benefits in the same classification." 29 C.F.R. § 2590.712(c)(2)(i) (amended Jan. 13, 2014); *see also* IFRs Under the Parity Act, 75 Fed. Reg. at 5413.

60. The Parity Act also requires that if a plan "provides mental health or substance use disorder benefits in any classification of benefits..., mental health or substance use disorder benefits must be provided in every classification in which medical/surgical benefits are provided." 29 C.F.R. § 2590.712(c)(2)(ii).

61. The Plan violated the Parity Act by denying provides services that are less intensive than acute hospitalization and more intensive than outpatient therapy.

62. The actions of The Plan in failing to provide coverage for C.S.M.'s treatment violate the terms of the Plan, ERISA and its underlying regulations, and the Parity Act.

63. The actions of The Plan has caused damage to the S.M. Family in the form of denial of payment of C.S.M.'s treatment.

64. The Plan is responsible to pay for C.S.M.'s treatment claim along with pre-judgment interest and attorney's fees and costs pursuant to 29 U.S.C. §1132 (g).

## **RELIEF**

WHEREFORE, Plaintiffs seeks relief as follows:

65. Judgment in the amount of C.S.M.'s past due treatment claims from November 29, 2019, through February 5, 2020.

66. Pre-and post-judgment interest on the past due benefits pursuant to U.C.A. §15-1-1;

67. An award of attorney fees pursuant to 29 U.S.C. §1132(g); and

68. For such further relief as the Court deems equitable.

RESPECTFULLY SUBMITTED this 15th day of April, 2021.

BLACKLEY & WINGAD, ATTORNEYS AT LAW

*/s/ Jennie Wingad*
Jennie Wingad

*Attorney for Plaintiffs*